**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHASE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>               v.<br><br>KUCOIN, MICHAEL GAN, JOHNNY LYU, and ERIC DON,<br><br>                  Defendants. | No. _____<br><br>**JURY DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

Individually and on behalf of all others similarly situated, Plaintiff Chase Williams brings this action against Defendants KuCoin, Michael Gan, Johnny Lyu, and Eric Don.  Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of whitepapers of the digital tokens at issue, press releases, media reports, and other publicly disclosed reports and information about Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.  Plaintiff hereby alleges as follows:

## I.   INTRODUCTION

1.      On behalf of a class of investors who purchased ten digital tokens that KuCoin has sold through its online exchange since September 15, 2017 (the "Class"), without registering under applicable federal and state securities laws as an exchange or broker-dealer, and without a registration statement in effect for the securities it was selling, Plaintiff and members of the Class seek to recover the consideration paid for the tokens and the fees they paid to KuCoin in connection with their purchases of EOS, SNT, QSP, KNC, TRX, OMG, LEND, ELF, CVC, and TOMO (together, the "Tokens").

2.      A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions.  Various digital assets can reside on blockchains, including cryptocurrencies, such as Bitcoin and Ethereum (both discussed in greater detail below), as well as so-called "smart contracts" that operate under a set of predetermined conditions agreed on by users.  With smart contracts, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here,

are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

3.       Certain of these digital tokens are classified as "utility tokens."  Their primary purpose is to allow the holder to use or access a particular project.  For example, one private-jet company issues utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes.  A utility token presumes a functional network on which the token can be used.

4.       Other tokens are more speculative and are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project.  Although the tokens take value from the startup behind the project, they do not give the holder actual ownership in that startup.  Rather, investors purchase these tokens with the idea that their value will increase as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and KuCoin was required to register itself as an exchange with the SEC.  Neither the Issuers nor KuCoin filed any such registration statements.  Instead, KuCoin and the Issuers entered into contracts to list these Tokens for sale on the KuCoin exchange in violation of federal and state law.  As a result, KuCoin and the Issuers reaped billions of dollars in profits.

5.       The scheme worked as follows:  working to capitalize on the enthusiasm for cryptocurrencies like bitcoin, an Issuer would announce a revolutionary digital token.  This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure."  The Issuer would then sell some of its tokens in an initial coin offering ("ICO")

to a small group of investors and then turn to KuCoin to list the new token, at which point KuCoin would undertake its own efforts to promote sales, and to solicit and encourage purchases, by a wide universe of investors.  The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens.  KuCoin would profit handsomely as well by receiving a percentage of each trade and by receiving substantial payments from Issuers to have their tokens listed.

6.     The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities."  But the vast majority of these new tokens turned out to be empty promises.  They were not "better," "faster," "cheaper," "more connected," "more trustworthy" or "more secure" than what existed in the marketplace.  In reality, they often had no utility at all.  The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed. Indeed, all of the Tokens are now trading at a tiny fraction of their 2017–2018 highs.  One of the Tokens at issue, TRX, is down more than 95 percent from its 2018 high.  QSP was trading at around 72 cents in January 2018; today, it trades at around 0.7 cents.  After their ICOs, the prices of OMG and ELF tokens skyrocketed to more than $25 and $2.50 per token, respectively; today, they trade at around $0.56 and $0.06 per token.  The EOS token reached a high of $22.89.  Today, it is worth only $2.22.

7.     Investors were provided with scant information when deciding whether to purchase a token.  In fact, the only offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token.  These whitepapers would often omit, however, the robust disclosures that the securities laws and the SEC have long codified as essential to investor protections in initial public offerings, including use of "plain English" to

describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used, and a standardized format that investors could readily follow. Instead, these ICOs were the "Wild West"—with investors left to fend for themselves. Without the mandatory disclosures that would have been required had these ICOs been properly registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

8. In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised nearly $20 billion with virtually no regulatory oversight or guidance to investors. Issuers and exchanges like KuCoin, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture. In truth, these tokens are securities under federal and state securities laws.

9. On April 3, 2019, in a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), the SEC clarified that the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1] Prior to that time, a reasonable investor would not have concluded that these Tokens were securities that should have been registered with the SEC. But the Tokens are securities. For example, on September 30, 2019—nearly six months after releasing its Framework, and more than two years after the relevant ICO began—the SEC completed an investigation and found that

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

Block.one had violated the Securities Act by selling the digital token EOS, an unregistered security, to the public.  As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination that EOS was an unregistered security applies with equal force to the other Tokens.

10.     KuCoin and the Issuers wrongfully engaged in millions of transactions—including the solicitation, offer, and sale of securities—without registering the Tokens as securities, and without KuCoin registering with the SEC as an exchange or broker-dealer.  As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

11.     KuCoin participated in illegal solicitations and sales of securities for which no registration statement was in effect, and as to which no exemption from registration was available. Each ICO was a generalized solicitation made using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the securities were offered and sold to Plaintiff and the general public in the United States.  Because these sales, as well as KuCoin's underlying contracts with the Issuers that facilitated these sales, violated both the Securities Act and the Exchange Act, Plaintiff and the Class are entitled to recover the consideration paid for the Tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees paid to KuCoin on such purchases.

12.     In addition, numerous Class members resided, and were present at the time they traded in the Tokens, in States that provide their own "Blue Sky" protections for investors,

---

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

including the State of Texas.[3]  These States generally provide that the investors in these States who purchased these unregistered Tokens are entitled to rescission or damages, as well as interest thereon, attorneys' fees, and costs.

## II.   PARTIES

### A.  Plaintiff

13.    Plaintiff Chase Williams is a resident of Houston, Texas.  Williams and members of the Class purchased Tokens on KuCoin and pursuant to contracts with KuCoin, from Texas during the Class Period.

### B.  Defendants

14.    Defendant KuCoin launched in September 2017, and claims to have "grown into one of the most popular crypto exchanges," serving "5 million users"—"[o]ne out of four crypto holders worldwide"—"across 207 countries and regions around the world."  KuCoin facilitates trades in digital assets, including the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for KuCoin taking a fee for every transaction it facilitates.  Since its founding, KuCoin has regularly and intentionally engaged in numerous online securities transactions inside the United States, with United States residents, without complying with U.S. laws.  In addition, KuCoin has promoted inside the United States the sale of digital assets on its exchange.

15.    KuCoin's initial CEO, defendant Michael Gan, founded KuCoin as a Seychelles entity headquartered in Hong Kong, but has since moved KuCoin's headquarters to Singapore.  In

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Like the federal securities laws, Texas defines "securities" to include "investment contracts," which has been interpreted by Texas courts at least as broadly as the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

March 2020, KuCoin announced the establishment of KuGroup (consisting of three business groups—KuCoin Global, KuCloud, and the KuChain and KCS Ecosystem) and appointed Gan as Chairman of KuGroup. In that role, Gan "oversee[s] the global strategy of KuCoin Global." On information and belief, Gan resides in Singapore.

16.     In March 2020, simultaneous with the announcement of KuGroup, Defendant Johnny Lyu, co-founder of KuCoin, was promoted to CEO of KuCoin Global. In that role, Lyu, is "responsible for the day-to-day operations of KuCoin." On information and belief, Lyu resides in Singapore.

17.     Defendant Eric Don is co-founder and President of KuCoin, having previously served as the Chief Operating Officer ("COO") of KuCoin. On information and belief, Don resides in Singapore.

## III.   JURISDICTION AND VENUE

18.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

19.     Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78t, 78cc(b).

20.     This Court has jurisdiction over the statutory claims of violations of Tex. Rev. Civ. Stat. art. 581-33 pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

21.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' offer

or sale of unregistered securities and failure to register with the SEC as an exchange or broker-dealer.

22.    Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in the district where offers or sales at issue took place.  KuCoin has transacted business in the Southern District of New York, including by advertising a token listed on KuCoin on a billboard in Times Square, and by recruiting a New York City-based firm, Global Blockchain Innovative Capital, to join KuCoin's "Global Titan Ambassador program" and "work with KuCoin on the discovery and acceleration of early blockchain projects, as well as KuCoin . . . ecosystem development."

## IV.    FACTUAL ALLEGATIONS

### A.  The First Cryptocurrency:  Bitcoin

23.    A cryptocurrency is a digital asset designed to work as a medium of exchange or a store of value or both.  Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

24.    Bitcoin was the world's first decentralized cryptocurrency.  It is also the largest and most popular cryptocurrency, with a market capitalization of approximately $126 billion.  Bitcoin spawned a market of other cryptocurrencies that, together with bitcoin, have a current market capitalization of approximately $192 billion.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

25.    At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

26.     Blockchains act as the central technical commonality across most cryptocurrencies. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

27.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

28.     Mining is one way an individual can acquire cryptocurrencies like bitcoin.  A second way to acquire cryptocurrencies is to acquire them through an online "cryptocurrency exchange."  Online cryptocurrency exchanges are one place to purchase Bitcoin and other cryptocurrencies.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

29.     In April 2013, there were only seven cryptocurrencies listed on coinmartketcap.com, a popular website that tracks the cryptocurrency markets.  As of this filing, the site monitors more than 2,000 cryptocurrencies.

30.     For a time, Bitcoin was the only cryptocurrency available on exchanges.  As cryptocurrencies grew in popularity, exchanges began listing other cryptocurrencies as well, and trading volumes expanded.  In early 2013, daily Bitcoin trading volumes hovered between $1

million and $25 million.  By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

**B. Ethereum**

31.    Ethereum is the second-most popular cryptocurrency, with a market capitalization of approximately $16 billion.   The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.   Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," *i.e.*, the overall network of individuals using Ethereum or participating in the development of its network.  This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.)

32.    Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.   A smart contract is a program that verifies and enforces the negotiation or performance of a contract.   Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

33.    As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

34.    A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

35.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

36.     An ERC is an application standard for a smart contract.  Anyone can create an ERC and then seek support for that standard.  Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.  This is because it allows individuals who are less technically proficient to make use of smart contract functionality.  The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

**C.  ERC-20 Tokens**

37.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain.  These tokens are known as "ERC-20 tokens."

38.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than cryptocurrencies like Bitcoin and Ethereum because they do not operate on an independent blockchain.

39.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

40.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then

distribute and make available for purchase.  Even people without any technical expertise can have

their own ERC-20 token created for them, which can then be marketed to investors.

### D.  The Advent Of The "ICO"

41.     Between 2014 and 2016, Bitcoin's price fluctuated between $200 and $800.  During

this same time frame, ether's price fluctuated between roughly $1 and $10.

42.     By the end of 2016, interest in cryptocurrencies began to accelerate, with prices

growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone,

bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's

growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately $8

per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of

approximately 17,000 percent over that period.

43.     Seeking to capitalize on the growing enthusiasm for cryptocurrencies, many

entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for

newly created ERC-20 tokens, such as the Tokens.  Many of these issuers improperly chose not to

register their securities offerings with the SEC in order to save money and not "open their books"

to the SEC, even though investors thereby were denied access to critical information they would

have received from an SEC-registered offering.  As a result, investors, including investors in digital

tokens, were denied access to critical information before making their investment decision.

44.     Potential purchasers were reached through various cryptocurrency exchanges and

social media sites that published active and upcoming ICOs.

45.     Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these

ICOs was registered with the SEC.  Of the approximately 800 ICOs launched between 2017 and

2018, the vast majority were issued using the ERC-20 protocol.

46.     ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO, and promoted the sale of the tokens.  They typically advertised the creation of a "new blockchain architecture."

47.     The whitepapers typically contained vastly less information than would have been included in an SEC registration statement.  For example, whitepapers typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

48.     As a result of the lack of information, trading of tokens on exchanges such as KuCoin was rife for manipulation.  In fact, as Aries Wanlin Wang, the founder of a rival exchange, admitted, "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Mr. Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago.  When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of cryptocurrency, just as they were on the US stock exchange so many years ago."

49.     The Issuers declined to register the Tokens with the SEC, and KuCoin declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

### E.  KuCoin Solicited And Sold ERC-20 Tokens

50.     KuCoin solicited the buying and selling of ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.

51.     KuCoin has touted the over 200 "high-quality blockchain projects" that trade on its exchange, and purports that its web traffic "ranks [in] the top 5 globally" among cryptocurrency exchanges, with daily trading volume of up to $500 million and "the smallest bid-ask spread in the industry," providing users with "[h]igh [l]iquidity."

52.     Lyu has boasted that "KuCoin has proved its value in the crypto space by offering easy-to-use, secured and efficient financial services to users internationally.  Over 65 billion transaction volume has been handled so far and we will continue our journey to make KuCoin the best place to trade."

53.     Industry estimates indicate that KuCoin earns millions of dollars of profit each month, and as of March 2020, it had a market capitalization of approximately $85 million.

54.     KuCoin has taken numerous steps to build its profile in the United States and market itself to American users.  For example, KuCoin was a Sponsor of SF Blockchain Week 2019 in San Francisco, California, and was an Exhibitor at World Crypto Con Las Vegas 2018 in Las Vegas, Nevada.  Additionally, KuCoin joined the Blockchain Education Alliance, an industry group organized to "train the next generation of blockchain developers" that is affiliated with American universities.

55.     KuCoin has earned its substantial profits by building a platform that solicited the buying and selling of unregistered securities on a massive scale.  Defendants did this by taking advantage of the market's lack of sophistication with digital tokens, particularly ERC-20 tokens, and the market excitement for Bitcoin and Ethereum more generally.

56.     Shortly after an issuer launched an ICO, the issuer would quickly seek to have its tokens listed on cryptocurrency exchanges like KuCoin, in order to give the issuer access to millions of retail investors to whom they could market the tokens.

57.     KuCoin represents to potential investors that it "attempts to screen all tokens before they come to market," and Gan has publicly represented that KuCoin does not "list[] every project [that] approached us," and that KuCoin has "a strong project research team, consisting of over 20 professionals.  Together with our big data analysis system and global partners, we are committed to finding the best blockchain projects and bring[ing] [them] to the world before anyone else."

58.     Gan has emphasized that "KuCoin has been persistent in its pursuit of finding and supporting blockchain projects with real potential," and it "aims to assist blockchain projects in raising the needed funds, attracting market attention and improving industrial influence. . . .  We are always trying to find promising blockchain projects and by listing them, we could help them increase liquidity and get more public attention, these will help them develop better."

59.     Upon agreeing to list a new token on its cryptocurrency exchange, KuCoin typically advertises the listing to its user base by stating that it is "extremely proud to announce yet another great project coming to our trading platform."

60.     For example, KuCoin has described newly listed tokens as "world leading," and has offered incentives for users to trade tokens and to share token promotions on users' social media accounts:



## 🎁 THEKEY (TKY) gets listed on KuCoin! World premiere!
PUBLISHED 2018-02-06

This post is also available in: 简体中文 (Chinese (Simplified)), 한국어 (Korean)

**Dear Users,**

KuCoin is extremely proud to announce yet another great project coming to our trading platform. THEKEY (TKY) is now available on KuCoin. Supported trading pairs including TKY/BTC, TKY/ETH and TKY/NEO. Please take note of the following schedule:

1. TKY Deposits: 18:00 Feb 6, 2018 (UCT+8)

2. TKY Trading: 22:00 Feb 6, 2018 (UCT+8)

3. TKY Withdraw: 22:00 Feb 13, 2018 (UCT+8)

**THEKEY (TKY) Introduction:**

THEKEY Project, a world-leading solution provider in IDV industry, is here to leverage innovations in Blockchain and Smart Contract technologies to develop its second-generation IDV solution to address all the above-mentioned issues in the internet world.

ICO Price: 1 TKY = 0.0352 USD (0.00022 NEO)

THEKEY Website: https://www.thekey.vip/

THEKEY Telegram: https://t.me/joinchat/FkZtERGQ1qUEU7iAzC6xVQ

THEKEY Whitepaper: Click Here

17

**THEKEY(TKY) Competition Details**
ActivityLink **https://www.kucoin.com/#/rank/TKY**

Competition running from 2018/02/06 22:00:00 to 2018/02/11 23:59:59 （UCT+8）

**No.1:  Trading Competition Win 2,000,000 TKY and 5 BTC**

We will rank traders from 1 to 500 in terms of the total TKY volume traded on your
account (includes both buys & sells) during the competition period.

**No.2: TKY Net Deposits Competition**

We will ranking TKY Net Deposits (deposits minus withdrawals) from 1 to 500 during
the competition period. Totally 8 BTC rewards will be allocated in the following format.

**No.3: Follow and Retweet to Win 7 BTC**

KuCoin and THEKEY (TKY) are running a joint promotion to celebrate the listing of TKY
on KuCoin. We are offering 7 BTC for retweeting the tweet on Twitter.

61.     As another example, KuCoin, in celebration of its second anniversary, ran a
promotion during which tokens including TRX were given away to purchasers who participated
in certain activities through KuCoin's platform:

18



## KuCoin's 2nd Anniversary: TRON Day $150,000 to Give Away!

2019/09/26 11:45:16   Promotions

**Dear KuCoin Users,**

To celebrate the 2nd anniversary of KuCoin and as a big thank you for the continued support from the community, KuCoin will work with TRON to give away $150,000 tokens including TRX, WIN, BTT and TRC20-USDT.

62.     KuCoin has also earned profits by charging Issuers hundreds of thousands of dollars in "volume-boosting fees," in exchange for which KuCoin reportedly engaged in wash trading to artificially increase trading volume for low-performing tokens.   Industry participants have condemned this reported practice as "a massive conflict of interest" and "fraud," noting that "[i]t makes it look like there's more interest than there is," which "creat[es] false impressions about how the coin trades" and in turn enables "the founders [to] get rich off of the poor sods buying the coin thinking there's interest."

63.     Each of the Tokens was listed on KuCoin, pursuant to agreements with the Issuers, and each was traded by members of the Class.  Two of the Tokens that were listed on, and promoted by, KuCoin (QSP and LEND) were delisted within 14 months of their listing on the exchange.

64. KuCoin profited handsomely from listing of new tokens on its platform. In addition to receiving fees for each transaction performed on its exchange, KuCoin received large cash payments from Issuers seeking to get their tokens listed.

**F. Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities**

65. In connection with the ICOs, from 2017 until early 2019, the Issuers and KuCoin made statements that would have led a reasonable investor to conclude that the Tokens were not securities.

66. <u>Issuers</u>. Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC). As an initial matter, Issuers refused to register the Tokens with the SEC, thus signaling to investors that these were not securities.

67. Issuers declared that the Tokens were not securities. For example, the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, expressed or implied. Although EOS Tokens may be tradable, they are not an investment, currency, security, commodity, a swap on a currency, security, or commodity or any kind of financial instrument.

68. Similarly, the TRON whitepaper stated that it "is not a security," and owning

> TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform. As an encrypted token used in TRON, TRX does not belong to any of the following categories: (a) currency of any type; (b) securities; (c) stock rights of a legal entity; (d) stocks, bonds, bills, warrants, certificates, investment contract, or other instruments affording similar rights.

69. The TRON whitepaper also misleadingly compared TRX to Bitcoin, which is a commodity. The TRON whitepaper asserted, for example, that its "distributed user registration

mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin, [t]he [TRON] market is based on blockchain and trade in virtual currency."

70.     At the time of the TRX ICO, TRON took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  In the face of promises that TRX would be "similar to Bitcoin," and considering the new technology at issue and TRON's other statements, many investors were understandably unaware that TRX tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.  Many of the other Tokens likewise misleadingly compared themselves to Bitcoin or Ethereum, which are not required to be registered as securities.

71.     The EOS whitepaper, for example, argued that EOS would replace Bitcoin and Ethereum.  The ELF whitepaper discussed, at length, how governance structures for cryptocurrencies like Bitcoin were "not well defined when [they were] created."  ELF insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum.  The OMG whitepaper discussed "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets.

72.     Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have concluded they were securities.

73.     KuCoin.  KuCoin's public representations suggested to users that its offerings of tokens did not require registration with the SEC because they did not constitute securities.  Gan has publicly represented that KuCoin is "trying [its] best to be regulated in every market," which is why it was able to raise $20 million in Series A funding from "two top VCs, IDG and Matrix."

Moreover, KuCoin's announcements of new token listings have included links to whitepapers stating, for example, that particular tokens "are not intended to be shares, securities, derivatives or interests in any managed investment scheme or any other financial products," and that the issuers "believe we are taking commercially reasonable steps to ensure that the token sale mechanics and issue of Tokens do not violate applicable laws and regulations."

74.     SEC.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens at issue in the Complaint, are securities.  In fact, it was not until six months after the Framework was issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

75.     Prior to that time, the SEC had not determined that ERC-20 tokens were securities. On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

76.     Other Commentary.  Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that

22

a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

77.     In sum, before the SEC issued its Framework on April 3, 2019, a reasonable investor would not have concluded that ERC-20 tokens were generally securities subject to the securities laws.  On the contrary, they were confronted with representations both from issuers and from cryptocurrency discussions that would have led them reasonably to believe they were not investing in securities.

**G.  The Tokens Are Securities**

78.     Within the last year, the SEC has clarified, with the benefit of labor-intensive research and investigations, that the Tokens are securities.  On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

79.     Among the most significant statements in the Framework is its description of how to analyze the various facts surrounding ICOs in making the determination of whether a given digital asset (including an ERC-20 token) is a security.  Under application of the Framework, the Tokens were securities at issuance.

80.     In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the fundamentals of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "*Howey* test" applies to any contract, scheme, or

transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers. Investors had a reasonable expectation of profit based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on cryptocurrency exchanges such as KuCoin.

1. **Under The SEC's April 2019 Framework, The Tokens Are Securities**

    a. **ERC-20 Investors Invested Money**

81.    Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*. The SEC Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

82.    Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens. The Tokens were listed on KuCoin, and KuCoin permitted investors to purchase ICOs with bitcoin and ether.

    b. **ERC-20 Investors Participated In A Common Enterprise**

83.    The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

84.     The Tokens are no different.  Investors were passive participants in the Tokens'
ICOs and the profits of each investor were intertwined with those of the Issuers and of other
investors.  Issuers typically conceded in their whitepapers that they sold Tokens in order to fund
their operations and promote their networks and thereby increase the value of the issued ERC-20
tokens.  Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and
controlled those assets.  Issuers would also typically hold a significant stake in the Tokens, and
thus shared in the profits and risk of the project.

85.     For example, promoters of the EOS token described the proceeds of their ICO as
"revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create
community driven business leveraging EOSIO software."  That money, in return, "will be returned
value for the network."  For the other Tokens as well, investors participated in a common enterprise
by purchasing the Tokens.

### c.  Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them

86.     As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser
may expect to realize a return through participating in distributions or through other methods of
realizing appreciation on the asset, such as selling at a gain in a secondary market."

87.     Investors in the Tokens, including Plaintiff and the Class, made their investment
with a reasonable expectation of profits.  The Tokens were sold to investors prior to a network or
"ecosystem" on which they could be used being fully developed.  For pre-functional tokens, such
as the Tokens at issue in the Complaint, the primary purpose for purchasing such Tokens was to
make a profit, rather than to utilize the Tokens themselves for a task.

88.     Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or
other  third  party  that  "provides  essential  managerial  efforts  that  affect  the  success  of  the

enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets thereby satisfy the *Howey* test:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> - The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>
>   o The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
>
>   o This also can be the case where the digital asset gives the holder rights to dividends or distributions.
>
> - The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.
>
> - Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.
>
> - The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.
>
>   o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.  For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.
>
> - There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.
>
> - There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and

the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  o The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

89.     The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

90.     For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature."  The Status Network, for instance, told investors the SNT tokens "will be transferrable 7 days after the end of the Contribution Period."

91.     The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials.

92.     The Tokens were not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation."  The whitepaper for the aelf Token, for example, promised to bring about "the next phase" and a "new paradigm" of blockchain technology, and acknowledged that "[b]uilding an ecosystem requires a large amount of capital," including "the funds raised during the Token sale."  Under the SEC's April 2019 Framework, the Tokens are securities under federal and state securities laws.

### d.  Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

93.     The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

94.     Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams.   ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

95.     Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

96.     The SEC explained, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

    o   Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).  This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that:  (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.  In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

- o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

- o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

- o Determining who will receive additional digital assets and under what conditions.

- o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

- o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

- o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

- o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

- o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

- o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

- o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

97.     Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network.  For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

   o   This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

   o   If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.  Relevant factors may include:

   o   There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

- o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

- o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

98.     Purchasers of pre-functional tokens, such as the Tokens, necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.  Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

99.     This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret

the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

100.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

101.    The Issuers of the Status SNT Tokens likewise wrote in its whitepaper it had only an "alpha" build of its product, but with the funds raised through its ICO, it hoped its technology would "reach[] widespread mobile use."  The whitepaper continued:  "Funds raised during the Contribution Period will be used solely for the development and benefit of the Status Network."

102.    However complex the resolution of the issue would strike a reasonable investor, the Tokens satisfy most if not all of the factors the SEC described in the Framework as relevant to its determination that a digital asset is a security.

### 2.    Each Token Is A Security

#### a.    EOS

103.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS tokens have been listed on KuCoin since at least October 14, 2017.

104.     EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other cryptocurrencies.   In addition to claiming EOS's technical superiority over other cryptocurrencies, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

105.     In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

  1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

  2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

106.     At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.   With promises that EOS would be better than other cryptocurrencies, many individuals were unaware that EOS tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.   One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

107.     The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.   This would not have been apparent at issuance, however, to a reasonable investor.   Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.   Purchasers were thereby misled into believing that EOS was something other than a security, when it *was* a security.

108.     Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

109.     EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

110.     EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.  The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

111.     Investors' profits were to be derived from the managerial efforts of others— Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

112.     Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

113.     The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

114.     Accordingly, under the SEC's Framework, the EOS token was a security.

115.     Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.  Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.  This enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

116.   The SEC's September 30, 2019 settlement with Block.one reflected the SEC's Framework for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities.  Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them.

117.   The SEC's determination that EOS was and is a security applies not only to EOS, but also to each of the other digital tokens discussed below.

**b.      Status (SNT)**

118.   Status Network's ("Status") SNT token ICO has been widely reported as one of the largest ICOs to date, having raised over $100 million in assets from the sale of unregistered SNT tokens over a 24-hour period from June 20 to June 21, 2017.

119.    After being distributed through the ICO, SNT tokens have been listed on KuCoin since at least December 13, 2017.



120.    In the month following the KuCoin listing, the price of the SNT token skyrocketed from less than 10 cents to more than 60 cents per token:

121.    At 10:00 a.m. today, the SNT token traded at less than 2 cents.

122.    Status made statements suggesting that SNT tokens were similar to Bitcoin, Ethereum, and other cryptocurrencies.  For example, the SNT whitepaper asserted that SNT was "[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the foundation necessary to give all stakeholders in a socioeconomic network equal footing."  In addition, the SNT whitepaper asserted that "the Status mobile Ethereum client" was "well suited

for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."

123.    At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With representations that SNT would be similar to other cryptocurrencies, many individuals were unaware that SNT tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all SNT tokens were issued by Status at creation at very little economic cost—and enormous potential upside—to the Status founders, Jarrad Hope and Carl Bennetts.

124.    The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which SNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that SNT was something other than a security, when it *was* a security.

125.    Investors purchased SNT tokens with the reasonable expectation that they would make a profit.

126.    SNT token holders stood to share in potential profits from the successful launch of the SNT token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the SNT ecosystem.

127.    Investors' profits were to be derived from the managerial efforts of others—Status, its co-founders, Hope and Bennetts, and the Status development team.  Investors in SNT relied on the managerial and entrepreneurial efforts of Status and its executive and development team to manage and develop the SNT software.  Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT.  The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point.  During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

128.    Investors in SNT thus reasonably expected Status, co-founders Hope and Bennetts, and Status's development team to provide significant managerial efforts after SNT's launch.

129.    The expertise of the issuers was critical in monitoring the operation of SNT, promoting SNT, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The SNT protocol and governance structure were predetermined before the ICO was launched.

130.    Accordingly, under the SEC's Framework, the SNT token was and is a security.

### c.    Quantstamp (QSP)

131.    The QSP ICO raised over $31 million in assets from the sale of unregistered QSP tokens over a period of time that extended from November 17 to November 19, 2017.

132.    After being distributed through the ICO, the issuer of QSP, Quantstamp, listed QSP tokens on KuCoin since at least November 29, 2017.

## Quantstamp Will Be Listed On KuCoin

2017/11/29 03:20:59   Announcements

KuCoin is proud to announce we are listing another high quality project today. Quantstamp (QSP) will be joining our special list on November 29 2017 16.00 (UTC+8). KuCoin traders will have access to QSP/BTC and QSP/ETH upon listing.

Users can start depositing and trading QSP on KuCoin November 29, 2017 at 16:00 (UTC +8).

133.   In the months following the KuCoin listing, the price of the QSP Token skyrocketed from less than 20 cents to more than 76 cents per token:



134.   At 10:00 a.m. today, the QSP token traded at less than 1 cent.

135.   Quantstamp's stated "goal is to create a permissionless and decentralized network much like Ethereum and Bitcoin." And Quantstamp's co-founder Steven Stewart has compared QSP tokens to other cryptocurrencies: "Ether is used for fueling token transfers and other state changes. We are committed to exclusively using QSP to fuel our protocol." Indeed, in the QSP whitepaper, Quantstamp represented to investors that "we are extending Ethereum with technology designed to ensure the security of smart contracts."

40

136.    In addition to comparing QSP tokens to other cryptocurrencies and characterizing Quantstamp as "extending Ethereum," Quantstamp publicly stated that it would use the funds raised through the ICO to continue to develop the Quantstamp protocol software.

137.    At the time of the QSP ICO, Quantstamp took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With comparisons to other cryptocurrencies, many individuals were unaware that QSP tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all QSP tokens were issued by Quantstamp at creation at very little economic cost—and enormous potential upside—to the Quantstamp founders.

138.    The creation of QSP tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which QSP tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that QSP was something other than a security, when it *was* a security.

139.    And the QSP whitepaper explicitly stated that the QSP tokens were "not intended to constitute securities in any jurisdiction"—investors thus reasonably understood that QSP was not subject, at issuance, to U.S. securities laws.

140.    Investors purchased QSP tokens with the reasonable expectation that they would make a profit.

141.     QSP token holders stood to share in potential profits from the successful launch of the QSP token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the Quantstamp ecosystem.

142.     The QSP whitepaper speculated that Quantstamp expected "every Ethereum smart contract to use the Quantstamp protocol to perform a security audit because security is essential." Quantstamp represented that since contract creators would "pay QSP tokens to get their smart contract verified," then as "the number of smart contracts grows exponentially, we expect demand from Contract Creators to grow commensurately."  Quantstamp's statements fueled speculation that "[t]here is a very large potential for [Quantstamp co-founder] Richard [Ma] to lead the product to a 9 or 10 figure value in a very short time frame . . . .  The ICO valuation offers outstanding value given the massive and probable growth they have planned."  And investors were participating in a common enterprise with Quantstamp, since any profits were intertwined with the success of Quantstamp and other investors.

143.     Investors' profits were to be derived from the managerial efforts of others— Quantstamp, its co-founders, and the Quantstamp development team.  The QSP whitepaper advertises on its cover page that the Quantstamp "team is made of [sic] up of software testing experts who collectively have over 500 Google Scholar citations."  Investors in QSP relied on the managerial and entrepreneurial efforts of Quantstamp and its executive and development team to manage and develop the Quantstamp protocol software.

144.     Investors in QSP reasonably expected Quantstamp and Quantstamp's development team to provide significant managerial efforts after QSP's launch.

145.    The expertise of the issuers was critical in monitoring the operation of QSP, promoting QSP, and deploying investor funds.  Investors had little choice but to rely on their expertise.

146.    Accordingly, under the SEC's Framework, the QSP token was and is a security.

### d.    Kyber Network (KNC)

147.    The KNC ICO raised approximately $52 million from the sale of unregistered KNC tokens in September 2017.

148.    After being distributed through the ICO, KNC tokens have been listed on KuCoin since at least September 26, 2017.

149.    In the months following the KuCoin listing, the price of the KNC token skyrocketed from less than $2 to more than $5.40 per token:



150.    At 10:00 a.m. today, the KNC token traded at less than 50 cents.

151.    KNC tokens were advertised as being an improvement on Bitcoin, Ethereum, and other cryptocurrencies.  KNC's issuer, Kyber Network, publicly stated that KNC would "be the FIRST deflationary token with a staking mechanism" and that an upgrade to the Kyber Network protocol would result in "ultimately enhancing liquidity for the ecosystem, Kyber Network growth, and KNC value creation."

152.     In the KNC whitepaper, for example, the issuers of KNC tokens made the following representation:  "The collected KNC tokens from the fees, after paying for the operation expenses and to the supporting partners, will be **_burned_**, i.e. taken out of circulation.  The burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces."

153.     At the time of the KNC ICO, Kyber Network took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With promises that KNC would be better than other cryptocurrencies, many individuals were unaware that KNC tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all KNC tokens were issued by Kyber Network at creation at very little economic cost—and enormous potential upside—to the Kyber Network founders.  Approximately 39 percent of the KNC tokens minted into circulated were reserved for the company and its founders and advisors.

154.     The creation of KNC tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which KNC tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that KNC was something other than a security, when it *was* a security.

155.     Investors purchased KNC tokens with the reasonable expectation that they would make a profit.

156.     KNC token holders stood to share in potential profits from the successful launch of the KNC token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the KNC ecosystem.

157.     KNC tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.

158.     Investors' profits were to be derived from the managerial efforts of others—Kyber Network, its co-founders, and the Kyber Network development team.  Investors in KNC relied on the managerial and entrepreneurial efforts of Kyber Network and its executive and development team to manage and develop the KNC software.

159.     Investors in KNC reasonably expected Kyber Network and Kyber Network's development team to provide significant managerial efforts after KNC's launch.

160.     The expertise of the issuers was critical in monitoring the operation of KNC, promoting KNC, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The KNC protocol and governance structure were predetermined before the ICO was launched.

161.     Accordingly, under the SEC's Framework, the KNC token was and is a security.

            e.     **TRON (TRX)**

162.     The TRX ICO took place in August 2017 and raised approximately $70 million over a three-day period through the sale of 35 percent of unregistered TRX tokens.

163.     On August 28, 2018, TRX's issuer, TRON, listed the TRX token on KuCoin:

## Tron (TRX) Gets Listed on KuCoin!

2018/08/28 06:54:37   Promotions

**Dear KuCoin Users,**

KuCoin is extremely proud to announce yet another great project coming to our trading platform.

**Tron (TRX)** is now available on KuCoin.

Supported trading pairs include **TRX/BTC** , **TRX/ETH** .

KuCoin will continue to support deposits of TRON (TRX) tokens to the original ERC-20 address. The TRX tokens held on KuCoin will automatically be swapped into the MainNet TRX coins.

Please take note of the following schedule:

**Tron (TRX) Deposits Effective Immediately**

**Tron (TRX) Buying order:** 19:30 August 28, 2018 (UTC+8)

**Tron (TRX) Selling order:** 20:00 August 28, 2018 (UTC+8)

**Tron (TRX) Withdrawal:** 20:00 August 30, 2018 (UTC+8)

164.     In June 2017, TRON published the first version of the "TRON whitepaper." Casting the TRON protocol as an attempt to "heal the Internet," the whitepaper described the protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated." The whitepaper asserted that, through TRX, content providers would no longer need to pay high fees to centralized platforms such as Google Play and Apple's App Store.

165.     The TRON whitepaper stated that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform." The whitepaper identified potential "risks after supervisory regulations are formed." This disclaimer merely contemplated potential *future* regulations that could impact the status of the TRX offering, indicating the regulations did not apply at the time:

Risks after supervisory regulations are formed: It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, the electronic tokens purchased during the ICO period may be affected. The impacts include, but are not limited to, price and stability fluctuations and restraints.

On this basis, and the others described below, investors reasonably understood that TRX was not subject, at issuance, to U.S. securities laws.

166.     TRON promoted TRX as being similar to Bitcoin.  The TRON whitepaper asserted, as examples, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin," "[t]he [TRON] market is based on blockchain and trade in virtual currency."  By contrast, TRON issued nearly all of the TRX tokens up front, at very little economic cost—and enormous potential upside—to TRON's founders.

167.     The creation of TRX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which TRX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that TRX was something other than a security, when it *was* a security.

168.     Investors purchased TRX tokens with the reasonable expectation that they would make a profit.

169.    TRX token holders stood to share in potential profits from the successful launch of the TRX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TRX ecosystem.

170.    Investors' profits were to be derived from the managerial efforts of others—the TRON Foundation, its co-founders, and the development team.  Investors in TRX relied on the managerial and entrepreneurial efforts of the TRON Foundation and its executive and development team to manage and develop the TRX software.

171.    Investors in TRX reasonably expected the TRON Foundation and the TRON Foundation's development team to provide significant managerial efforts after TRX's launch.

172.    The expertise of the TRON Foundation was critical in monitoring the operation of TRX, promoting TRX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The TRX protocol and governance structure were predetermined before the ICO was launched.

173.    Accordingly, under the SEC's Framework, the TRX token was and is a security.

### f.    OmiseGo (OMG)

174.    OmiseGO sold approximately 65 percent of its unregistered OMG Tokens to investors through its ICO on September 9, 2017, raising $25 million over a one-day period.

175.    In June 2017, OmiseGO published the "OmiseGO whitepaper."  The OMG whitepaper asserted that OmiseGO was building a "decentralized exchange, liquidity provider mechanism, clearinghouse messaging network, and asset-backed blockchain gateway."  As part of this system, OmiseGO announced the OMG token.  According to the whitepaper, "[o]wning OMG tokens buys the right to validate this blockchain, within its consensus rules."

176.    The OMG whitepaper was silent as to the regulatory nature of OMG tokens.  Instead, the whitepaper discussed, at length, "Bitcoin and Bitcoin-like systems" and how OMG

would serve as a "clearinghouse" for these type of assets.  The whitepaper provided an example of this use case where "Alice sells [bitcoin] for [ether] and Bob buys [bitcoin] for [ether], the trade is now cleared on the OMG chain."

177.    On October 14, 2017, KuCoin listed the OMG token:



Kucoin will add Ethereum market on 14th, October

2017/10/10 07:45:17  Announcements

Kucoin will add Ethereum market at 12:00 14th, October (UTC+8), initial supported crypto currencies are KCS/ETH, NEO/ETH, KNC/ETH and OMG/ETH. We will continuously add other crypto currencies to this market in the future.

178.    In the months following the KuCoin listing, the price of the OMG Token skyrocketed from less than $10 to more than $25 per token:

179.    At 10:00 a.m. today, the OMG token traded at approximately 56 cents.

180.    At the time of the OMG ICO, OmiseGO took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that OMG had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all

OMG were issued by OmiseGO at creation at very little economic cost—and enormous potential upside—to the OmiseGO founders.

181.    The creation of OMG tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which OMG tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that OMG was something other than a security, when it *was* a security.

182.    Investors purchased OMG tokens with the reasonable expectation that they would make a profit.

183.    OmiseGO token holders stood to share in potential profits from the successful launch of the OMG token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the OMG ecosystem.

184.    Investors' profits were to be derived from the managerial efforts of others— OmiseGO, its co-founders, and OmiseGO development team.  Investors in OMG relied on the managerial and entrepreneurial efforts of OmiseGO and its executive and development team to manage and develop the OMG software.

185.    Investors in OMG reasonably expected OmiseGO and its development team to provide significant managerial efforts after OMG's launch.

186.    The expertise of OmiseGO was critical in monitoring the operation of OMG, promoting OMG, and deploying investor funds. Investors had little choice but to rely on their expertise. The OMG protocol and governance structure were predetermined before OMG was launched.

187.    Accordingly, under the SEC's Framework, the OMG token was and is a security.

### g.    ETHLend (LEND)

188.    The LEND ICO raised approximately $17 million from the sale of unregistered securities in November 2017.

189.    On December 1, 2017, KuCoin listed the LEND token:[4]

## ETHLend Will Be Listed On KuCoin December 1

2017/12/01 04:27:40   Announcements

KuCoin is proud to announce it will be listing ETHLEND(LEND) on December 1st 2017.

KuCoin traders will have access to LEND/BTC and LEND/ETH trading pairs upon listing.

**Users can start depositing and trading ETHLEND(LEND) on KuCoin Decemeber 1st, 2017 at 17.30 (UTC+8).**

**About ETHLend:**

ETHLend introduces decentralized lending on Ethereum network by using ERC-20 compatible tokens or Ethereum Name Service (ENS) domains as a collateral. ETHLend solves the problem on reducing the loss of loan capital on default.

On healthy loan relationships the loan is paid back. However, the pseudo-anonymous nature of Ethereum blockchain network opens the possibility to avoid repayment of the loan since the lender might not have all the necessary details of the borrower to enforce the debt in the borrower's jurisdiction.

Moreover, enforcement in a decentralized environment, where the parties can be from any part of the world, might not be efficient.

**ETHLend provides decentralized solutions to avoid loss of capital and to make one true global lending market available.**

Learn more about the project here:
https://ethlend.io
https://coinmarketcap.com/currencies/ethlend/

---

[4] KuCoin subsequently delisted LEND on December 21, 2018.

190.    In the months following the KuCoin listing, the price of LEND skyrocketed from less than 8 cents to more than 37 cents per token:



191.    At 10:00 a.m. today, the LEND[5] token traded at less than 3 cents.

192.    The LEND whitepaper, released by a company called ETHLend, stated that the LEND platform "provides secured lending with the use of ERC-20 compatible tokens as a collateral.  For example, users with a token portfolio are not required to sell the tokens to receive liquidity."  ETHLend promoted the LEND token as enabling individuals to "borrow[] Ether to participate in different ICOs, buy[] dips (bear market movements) and purchas[e] tokens from the exchange for investment strategies without the need to sell tokens."

193.    The LEND whitepaper was silent as to the regulatory nature of LEND tokens. Instead, the whitepaper discussed how LEND would be used "as the medium of exchange" and "the main utility that is used for lending and borrowing within the Ethereum network." It asserted that this would "allow all ETH and ERC20 token holders the ability to unlock billions of dollars' worth of liquidity" and that it would "do the same with Bitcoin in the near future."  Given its

_____

[5] In September 2018, the LEND token was rebranded as the "Aave token."

52

supposed relationship to Ethereum and Bitcoin, investors reasonably understood that LEND was not subject, at issuance, to U.S. securities laws.

194.    At the time of the LEND ICO, ETHLend took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that LEND had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all LEND were issued by ETHLend at creation at very little economic cost—and enormous potential upside—to the ETHLend founders.

195.    The creation of LEND tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which LEND tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that LEND was something other than a security when it *was* a security.

196.    Investors purchased LEND tokens with the reasonable expectation that they would make a profit.

197.    LEND token holders stood to share in potential profits from the successful launch of the LEND token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the LEND ecosystem.

198.    Investors' profits were to be derived from the managerial efforts of others—ETHLend, its co-founders, and the ETHLend development team.  Investors in LEND relied on the managerial and entrepreneurial efforts of LEND and its executive and development team to manage and develop the LEND software.

199.    Investors in LEND reasonably expected ETHLend and the ETHLend development team to provide significant managerial efforts after LEND's launch.

200.    The expertise of ETHLend was critical in monitoring the operation of LEND, promoting LEND, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The LEND protocol and governance structure were predetermined before the ICO was launched.

201.    Accordingly, under the SEC's Framework, the LEND token was and is a security.

### h.    aelf (ELF)

202.    In December 2017, aelf sold 25 percent of its unregistered ELF tokens to investors through private placement, raising $25 million.

203.    In November 2017, aelf published the "aelf whitepaper."  The whitepaper "envision[ed] aelf as a highly efficient and customizable OS and [that would] l become the 'Linux system' in [the] Blockchain community."  As part of this system, aelf announced the ELF token. According to the whitepaper, "[ELF] Token holders have the greatest right in the future of aelf, and token holders' interests are linked with the destiny of aelf, in particular those with long-term locked-in tokens in particular."

204.    The aelf whitepaper was silent as to the regulatory nature of ELF tokens.  Instead, the whitepaper discussed, at length, how governance structures for cryptocurrencies like Bitcoin were "not well defined when [they were] created."  aelf insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum because "vital

decisions [in aelf] will be carried out through a mechanism that resembles **representative democracy**." (Emphasis added.)

205. On March 4, 2018, KuCoin listed the ELF token:

## aelf(ELF) gets listed on KuCoin!

2018/03/04 06:06:14   Promotions

**Dear Users,**

KuCoin is extremely proud to announce yet another great project coming to our trading platform. aelf(ELF) is now available on KuCoin. Supported trading pairs including ELF/BTC, ELF/ETH. Please take note of the following schedule:

1. ELF deposits and withdraw: 18:00 Mar 4, 2018 (UTC+8)
2. ELF trading: 22:00 Mar 4, 2018 (UTC+8)

**aelf(ELF) Introduction:**

aelf as a highly efficient and customizable OS that will become the "Linux system" for Blockchain. Take Linux as an example–Linux Kernel and various Linux versions constitute the large and successful Linux family. Linux Kernel resolves the most fundamental, critical and time-consuming parts, allowing other developers to make customized systems based on application scenarios and customer needs. This makes Linux the most popular server OS, and it supports all kinds of industries.

aelf(ELF) Official Website: https://aelf.io/

aelf(ELF) Whitepaper: click here

206. In the months following the KuCoin listing, the price of the ELF Token skyrocketed from $1.25 to almost $2.00 per token:



207.    At 10:00 a.m. today, the ELF token traded at approximately 6 cents.

208.    At the time of the ELF ICO, aelf took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that ELF had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ELF were issued by aelf at creation at very little economic cost—and enormous potential upside—to the aelf founders.

209.    The creation of ELF tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ELF tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ELF was something other than a security, when it *was* a security.

210.    Investors purchased ELF tokens with the reasonable expectation that they would make a profit.

211.    The aelf token holders stood to share in potential profits from the successful launch of the ELF token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ELF ecosystem.

212.    Investors' profits were to be derived from the managerial efforts of others—aelf, its co-founders, and aelf's development team.  Investors in ELF relied on the managerial and

entrepreneurial efforts of aelf and its executive and development team to manage and develop the ELF software.

213.    Investors in ELF reasonably expected aelf and its development team to provide significant managerial efforts after ELF's launch.

214.    The expertise of aelf was critical in monitoring the operation of ELF, promoting ELF, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ELF protocol and governance structure were predetermined before ELF was launched.

215.    Accordingly, under the SEC's Framework, the ELF token was and is a security.

### i.    CIVIC (CVC)

216.    Over its two-day ICO, from June 20-21, 2017, Civic raised approximately $33 million in proceeds from the sale of 33 percent of CVC tokens.  Civic retained 33 percent of those tokens and allocated an additional 33 percent "for distribution to incentivize participation in the ecosystem."



217.    In June 2017, Civic published the first version of the "Civic whitepaper."  In its whitepaper, Civic stated that it was "building an ecosystem that is designed to facilitate on-

demand, secure and low-cost access to identity verification ('IDV') services via the blockchain, such that background and personal information verification checks will no longer need to be undertaken from the ground up every time." It also introduced, for the first time, the CVC token "that participants in the ecosystem will use to transact in IDV-related services."

218.    After CVC tokens were distributed through the ICO, CVC tokens have been listed on KuCoin since at least December 13, 2017.

219.    The Civic Purchase Agreement stated that "[CVC] Tokens are not intended to be a digital currency, security, commodity, or any kind of financial instrument" and that "[CVC] Tokens do not represent or confer any ownership right or stake, share, security, or equivalent rights, or any right to receive future revenue shares, intellectual property rights or any other form of participation in or relating to the Ecosystem and/or Company and its corporate affiliates."

220.    Investors thus reasonably understood that CVC was not subject, at issuance, to U.S. securities laws.

221.    At the time of the CVC ICO, Civic took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked. Many individuals were unaware that CVC had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all CVC were issued by Civic at creation at very little economic cost—and enormous potential upside—to the Civic founders.

222.    The creation of CVC tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which CVC tokens were created is relevant for determining that they are securities, it was only

after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that CVC was something other than a security, when it *was* a security.

223.    Investors purchased CVC tokens with the reasonable expectation that they would make a profit.

224.    CVC token holders stood to share in potential profits from the successful launch of the CVC token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the CVC ecosystem.

225.    Investors' profits were to be derived from the managerial efforts of others—Civic, its co-founders, and the CVC development team. Investors in CVC relied on the managerial and entrepreneurial efforts of Civic and its executive and development team to manage and develop the CVC software.

226.    Investors in CVC reasonably expected Civic and its development team to provide significant managerial efforts after CVC launch.

227.    The expertise of Civic was critical in monitoring the operation of CVC, promoting CVC, and deploying investor funds. Investors had little choice but to rely on their expertise. The CVC protocol and governance structure were predetermined before the ICO was launched.

228.    Accordingly, under the SEC's Framework, the CVC token was and is a security.

### j.    TomoChain (TOMO)

229.    TomoCoin ("TOMO") was launched through use of the ERC-20 protocol. At launch, 100 million tokens were created through use of the ERC-20 protocol.

230.    Tomochain PTE Ltd. ("TomoChain"), TOMO's issuer, sold 34 percent of TOMO tokens to investors through its ICO, raising approximately $8.5 million over a three-day period.

231.    On May 24, 2018, KuCoin announced and promoted the listing of TOMO on its

exchange:

# TomoChain (TOMO) gets listed on KuCoin!

PUBLISHED 2018-05-14

This post is also available in: 简体中文 (Chinese (Simplified)), 한국어 (Korean)

Dear Users,

KuCoin is extremely proud to announce yet another great project coming to our trading platform. **TomoChain (TOMO)** is now available on KuCoin, you can **deposit** TomoChain (TOMO) now. Supported trading pairs including **TOMO/BTC**, **TOMO/ETH**. Please take note of the following schedule:

TOMO withdrawal: 20:00 May 14, 2018 (UTC+8)

TOMO trading: 22:00 May 14, 2018 (UTC+8)

232.    In June 2018, Tomochain published the "TomoChain whitepaper."  TomoChain

casted itself as a "a blockchain infrastructure framework, which is an open-source, high

performance, nearly zero (economically) fee and instant confirmation blockchain that can

process billions of financial transactions per day."  The whitepaper also introduced TOMO,

which it advertised as "the reserve cryptocurrency with all the third-party apps running on

TomoChain."

233.    TomoCoin promoted itself as being similar to bitcoin and ether.  The whitepaper

asserted that, "[l]ike other cryptocurrencies such as Bitcoin and Ether, units of TomoCoin are

fractionally divisible, fungible and transferable to other TomoCoin holder."  In describing the

TomoChain "Reward Engine," TomoChain asserted that the "process mimics Bitcoin block

rewards in that at a fixed interval, the Reward Engine will emit a predetermined amount of token

to ReplyBlock users based on their relative contributions to the application."

234.    The Terms of Sale for the TOMO asserted that TOMO were not securities:

60

> The Tomocoins are not and shall not be construed as any form of digital currency (other than the Tomocoins themselves being the native and dedicated currency for the Toma Platform and the Toma network), shares or security, commodity or any kind of financial instrument or product.

On this basis, and the others described below, investors reasonably understood that TOMO was not subject, at issuance, to U.S. securities laws.

235.    At the time of the TOMO ICO, TomoChain took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  In the face of promises that TOMO "like other cryptocurrencies such as Bitcoin and Ether," and considering the new technology at issue, many individuals were understandably unaware that TOMO tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all TOMO were issued by TomoChain at creation at very little economic cost—and enormous potential upside—to the TomoChain founders.

236.    The creation of TOMO tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which TOMO tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that TOMO was something other than a security, when it *was* a security.

237.    Investors purchased TOMO tokens with the reasonable expectation that they would make a profit.

238.   TOMO token holders stood to share in potential profits from the successful launch of the TOMO token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TOMO ecosystem.

239.   Investors' profits were to be derived from the managerial efforts of others—TomoChain, its co-founders, and TomoChain's development team.  Investors in TOMO relied on the managerial and entrepreneurial efforts of TomoChain and its executive and development team to manage and develop the TomoChain software.

240.   Investors in TOMO reasonably expected TomoChain and TomoChain's development team to provide significant managerial efforts after TOMO's launch.

241.   The expertise of TomoChain was critical in monitoring the operation of TOMO, promoting TOMO, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The TOMO protocol and governance structure were predetermined before the ICO was launched.

242.   Accordingly, under the SEC's Framework, the TOMO token was and is a security.

**H.  The Class Has Suffered Significant Damages From Defendants' Actions**

243.   As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Tokens—have suffered significant damages in an amount to be proven at trial.

244.   The Tokens today are worth far less than the price Plaintiff and the Class paid for them.

245.   To the extent Plaintiff still holds any Tokens, he hereby demands rescission and makes any necessary tender of the Tokens.

## V.  CLASS ALLEGATIONS

246.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks certification of the following class (together, the "Class"):  All persons who purchased any of the following tokens on the KuCoin exchange:  EOS, SNT, QSP, KNC, TRX, OMG, LEND, ELF, CVC, and TOMO, between September 15, 2017, and the present.  Accordingly, the Class Period is September 15, 2017 through the present.

247.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

248.    Plaintiff reserves the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

249.    The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

250.    Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

251.    Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiff does not have any interest that is in conflict with the interests of the members of the Class.

252.    Plaintiff and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

253.    Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

254.    Plaintiff seeks declaratory relief for himself and the Class, asking the Court to declare their purchase agreements with KuCoin void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for KuCoin; and KuCoin has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the class as a whole.

255.    Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether the Tokens are securities under federal and state law;

- Whether KuCoin operated as an unregistered exchange;

- Whether KuCoin operated as an unregistered broker-dealer;

- Whether KuCoin offered or sold the Tokens to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to void their purchase agreements with KuCoin and to recover the monies they paid thereunder.

256.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

257.    There will be no difficulty in the management of this action as a class action.

**FIRST CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(KuCoin)**

258.    Plaintiff realleges the allegations above.

259.    Section 5(a) of the Securities Act states:  "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. § 77e(a).

260.    Section 5(c) of the Securities Act states:  "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  *Id.* § 77e(c).

261.    When issued, the Tokens were securities within the meaning of Section 2(a)(1) of the Securities Act.  *Id.* § 77b(a)(1).  KuCoin promoted, solicited or sold purchases of the Tokens

from Plaintiff and members of the Class.  KuCoin thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

262.   Section 12(a)(1) of the Securities Act provides in relevant part:  "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  *Id.* § 77*l*(a)(1).

263.   Accordingly, KuCoin has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

264.   Plaintiff and the Class seek rescissory damages with respect to purchases of Tokens on KuCoin within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id.* § 77m.

**SECOND CAUSE OF ACTION**
**Contracts With an Unregistered Exchange**
**Sections 5 and 29(b) of the Exchange Act**
**(KuCoin)**

265.   Plaintiff realleges the allegations above.

266.   In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction

of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities." 17 C.F.R. § 240.3b-16.

267.    KuCoin has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because KuCoin has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

268.    KuCoin has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

269.    In the course of planning to operate and as operating as an unregistered exchange within the United States, KuCoin has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered exchange within the United States, KuCoin would make available for sale the issuers' digital tokens. The parties to these contracts thus reached an agreement whereby and pursuant to which KuCoin would operate in violation of section 5 of the Exchange Act.

270.    In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, in the performance of its contracts with the issuers of digital tokens, which is a contract for listing a security on an exchange, and pursuant to and consistent with its Terms of Use, KuCoin has entered into contracts with the members of the Class pursuant

to which the members purchased digital tokens through KuCoin and paid KuCoin fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which KuCoin was operating in violation of section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of section 5 of the Exchange Act.

271.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because KuCoin entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which KuCoin would be and was operating in violation of section 5.

272.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract."  15 U.S.C. § 78cc.

273.    Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with KuCoin and to recover, as rescissory damages, the fees they have paid under those contracts.

274.    Plaintiff and the Class seek to void contracts and recover damages with respect to purchases of Tokens on KuCoin within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id.* § 78cc(b).

### THIRD CAUSE OF ACTION
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(KuCoin)**

275.    Plaintiff realleges the allegations above.

276.    In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

277.    As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, KuCoin has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

278.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78(a)(4)(A).  In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.  KuCoin has operated as a broker during the Class Period by facilitating the sale of digital assets as part of other entities' ICOs, including by marketing the digital assets, accepting investors' orders, accepting payment for orders, and working with issuers to transfer digital assets to investors after payment.

279.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's

"regular business."  KuCoin has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by having a regular turnover inventory of securities, by purchasing digital assets for accounts in KuCoin's name (often at a discount to the ICO price), and by then selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

280.    In the course of planning to operate and as operating as an unregistered broker-dealer, KuCoin has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered broker-dealer within the United States, KuCoin would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which KuCoin would operate in violation of section 15(a)(1) of the Exchange Act.

281.    In the course of operating as an unregistered broker-dealer, in the performance of its contracts with the issuers of digital tokens, and pursuant to and consistent with its Terms of Use, KuCoin has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through KuCoin and paid KuCoin fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which KuCoin was operating in violation of section 15(a)(1) of the Exchange Act.

282.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because KuCoin entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the

contracts reached agreements whereby and pursuant to which KuCoin would be and was operating in violation of section 5.

283.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

284.     Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with KuCoin and to recover, as rescissory damages, the fees they have paid under those contracts.

285.     Plaintiff and the Class seek to void contracts and recover damages with respect to purchases of Tokens on KuCoin within the last three years and within one year from when an investor could adequately plead that a Token is a security. *Id.* § 78cc(b).

**FOURTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Section 20 of the Exchange Act**
**(Michael Gan, Johnny Lyu, and Eric Don)**

286.     Plaintiff realleges the allegations above.

287.     This Count is asserted against the Individual Defendants for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

288.     Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of KuCoin and its employees, and to cause KuCoin to engage in the wrongful conduct complained

71

of herein. Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange as described herein.

289. The Individual Defendants have the power to direct or cause the direction of the management and policies of KuCoin.

290. The Individual Defendants, separately or together, have sufficient influence to have either caused KuCoin to register as an exchange or prevented KuCoin from effecting transactions of securities as an unregistered exchange.

291. The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, KuCoin's failure to register as an exchange and KuCoin's offer of securities on an unregistered exchange.

292. By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## FIFTH CAUSE OF ACTION
### Control Person Liability for Violations of
### Sections 5 and 12(a)(1) of the Securities Act
### (Michael Gan, Johnny Lyu, and Eric Don)

293. Plaintiff realleges the allegations above.

294. This Count is asserted against KuCoin and the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

295. Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of KuCoin and its employees, and to cause KuCoin to engage in the wrongful conduct complained

of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

296.    The Individual Defendants have the power to direct or cause the direction of the management and policies of KuCoin.

297.    The Individual Defendants, separately or together, have sufficient influence to have caused KuCoin to solicit transactions of securities.

298.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, KuCoin's solicitation of securities.

299.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

**SIXTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(KuCoin)**

300.    Plaintiff realleges the allegations above.

301.    The Texas Securities Act forbids the offer or sale of unregistered securities.  Tex. Rev. Civ. Stat. art. 581-7(A)(1).  Any person who unlawfully offers or sells an unregistered security "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."  *Id.* art. 581-33(A)(1).

302.    When issued, the Tokens were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A).  KuCoin sold or solicited purchases of the Tokens to Plaintiff and members of the Class.  The Tokens were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

303.     The Tokens were offered or sold in the State of Texas, including without limitation through solicitations directed by KuCoin to Texas and received in Texas.

304.     Accordingly, KuCoin has violated the Texas Securities Act through KuCoin's sale of unregistered securities.

305.     Neither Plaintiff nor any Class members have received a rescission offer to refund the consideration paid for the Tokens that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

306.     Plaintiff and Class members who own Tokens hereby make any necessary tender and seek the consideration paid for any Tokens purchased on KuCoin in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the Tokens, costs, and reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

307.     Plaintiff and Class members who no longer own Tokens seek damages for purchases of Tokens on KuCoin within the last three years, in the amount of the consideration the buyer paid for the Tokens plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of:  (i) the value of the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; or (ii) the actual consideration received for the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; together with costs, reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

**SEVENTH CAUSE OF ACTION**
**Control Person Liability for Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(Michael Gan, Johnny Lyu, and Eric Don)**

308.   Plaintiff realleges the allegations above.

309.   Every person who directly or indirectly controls a seller liable under the Texas Securities Act for unlawfully selling unregistered securities is jointly and severally liable with and to the same extent as the seller, unless the controlling person "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Tex. Rev. Civ. Stat. art. 581-33(F).

310.   When issued, the Tokens were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A).  KuCoin sold or solicited purchases of the Tokens to Plaintiff and members of the Class.  The Tokens were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

311.   The Tokens were offered or sold in the State of Texas, including without limitation through solicitations directed by KuCoin to Texas and received in Texas.

312.   Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of KuCoin and its employees, and to cause KuCoin to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

313.   Accordingly, the Individual Defendants, as persons who indirectly or directly controlled KuCoin, have violated the Texas Securities Act through KuCoin's sale of unregistered securities.

314.    Neither Plaintiff nor any Class members have received a rescission offer to refund the consideration paid for the Tokens that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

315.    Plaintiff and Class members who own Tokens hereby make any necessary tender and seek the consideration paid for any Tokens purchased on KuCoin in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the Tokens, costs, and reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

316.    Plaintiff and Class members who no longer own Tokens seek damages for purchases of Tokens on KuCoin within the last three years, in the amount of the consideration the buyer paid for the Tokens plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of:  (i) the value of the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; or (ii) the actual consideration received for the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; together with costs, reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

## **PRAYER FOR RELIEF**

317.   On behalf of himself and the Class, Plaintiff requests relief as follows:

(a)  That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and directs that notice of this action be given to Class members;

(b)  That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

(c)  That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

(d)  That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled, including a declaration that the purchase agreements between each members of the Class and KuCoin are void;

(e)  That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under state law);

(f)  That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

(g)  That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

318.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a

trial by jury for all claims.


Dated:      April 3, 2020
            New York, New York


                                    Respectfully submitted,

    <u>/s/ Philippe Z. Selendy</u>            <u>/s/ Kyle W. Roche</u>
    Philippe Z. Selendy                 Kyle W. Roche
    Jordan A. Goldstein                 Edward Normand
    Oscar Shine                         Velvel (Devin) Freedman (*pro hac pending*)
    David Coon                          Jordana Haviv
    SELENDY & GAY, PLLC                 ROCHE CYRULNIK
    1290 Sixth Avenue, 17th Floor          FREEDMAN LLP
    New York, NY 10104                  99 Park Avenue, 19th Floor
    pselendy@selendygay.com             New York, NY 10016
    jgoldstein@selendygay.com           kyle@rcfllp.com
    oshine@selendygay.com               tnormand@rcfllp.com
    dcoon@selendygay.com                vel@rcfllp.com
                                        jhaviv@rcfllp.com

CERTIFICATION OF
SECURITIES CLASS ACTION COMPLAINT

I, Chase Williams, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.       I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.       I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.       I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.       During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities on Kucoin: Tomochain ("TOMO").

5.       During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.       I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.       I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

_____

Chase Williams
Houston, Texas